**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| _____ ) | |
| KATHLEEN M. SKINSKI ) | |
| 7341 Barbour Court ) | |
| Falls Church, Virginia  22043 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | C.A. No. _____ |
| PLANAR SYSTEMS, INC. ) | |
| 1195 NE Compton Drive ) | |
| Hillsboro, Oregon  97006 ) | |
| ) | |
| Serve:  Corporation Service Company ) | |
| 100 Shockoe Slip, 2nd Floor ) | |
| Richmond, Virginia  23219 ) | |
| Registered Agent ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**COMPLAINT**

COMES NOW THE PLAINTIFF, KATHLEEN M. SKINSKI, by counsel, and moves this Court for entry of judgment in her favor, and against the Defendant, PLANAR SYSTEMS, INC., and in support of such motion alleges and avers as follows:

**NATURE OF ACTION**

1.     This is a civil action against the Defendant alleging retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, when Plaintiff was terminated after notifying Defendant of her intention to exercise her FMLA rights.

2.     This action also states claims for gender discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and retaliation, in violation Title VII of the Civil Rights Act of 1964 after Plaintiff complained

about the discrimination and hostile work environment, and asked that action be taken to protect her.

## PARTIES

3.     Plaintiff Kathleen M. Skinski ("Ms. Skinski") is a resident and citizen of Falls Church (Fairfax County) in Commonwealth of Virginia.  At all times relevant hereto, Ms. Skinski worked remotely out of her home in Falls Church, Virginia.

4.     Defendant Planar Systems, Inc. ("Planar") is a foreign (Oregon) corporation, active and in good standing in the Commonwealth of Virginia, and which maintains an agent for the service of process in the Commonwealth of Virginia.

5.     Planar is a global manufacturer of digital display and signage technology, with customers and clients worldwide, including in the Commonwealth of Virginia.

6.     Ms. Skinski was an "eligible employee" or "employee" of Planar within the meaning of 29 U.S.C. §2611(2)(A) and 42 U.S.C. § 2000e(f).

7.     Planar is an "employer" within the meaning of 29 U.S.C. §2611(4)(A) and 42 U.S.C. §2000e(b).

8.     Planar is engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of twenty or more calendar weeks in the current or preceding year within the meaning of 29 U.S.C. § 2611 (4) (A), and over 15 employees in each of twenty or more calendar weeks in the current or preceding year within the meaning of 42 U.S.C. § 2000e(b).

## JURISDICTION

9.     This Court has jurisdiction over Plaintiff's claims pursuant to 29 U.S.C.

§ 2617 (the Family and Medical Leave Act), and Title VII of the Civil Rights Act of 1964 as

amended, 42 U.S.C. §2000e, *et seq*.

10.     The amount in controversy in this action exceeds the jurisdictional minimum

amount for this Court.

11.     Planar is present in and regularly conducts business in this judicial district, and

Ms. Skinski was employed by, and regularly conducted business on behalf of, Planar, in this

judicial district.

12.     The causes of action alleged in this action arose or originated within the Eastern

District of Virginia, and injury to Ms. Skinski occurred in this judicial district.

## VENUE

13.     Planar is present in and regularly conducts affairs and business activities in this

judicial district.

14.     The causes of action alleged in this action arose or originated in this judicial

district.

15.     The unlawful employment practices committed by Defendant caused injury to

Plaintiff in this judicial district, Plaintiff was employed in this judicial district, Planar conducts

business in in this judicial district, and Ms. Skinski would still be employed in this judicial

district but for the unlawful practices of the Defendant.

16.     Venue over Plaintiff's claims is proper in this Court pursuant to 28 U.S.C. § 1331

and 1343(4).

**PROCEDURAL STATUS**

17.     Ms. Skinski timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about August 29, 2022.

18.     The EEOC issued a Right to Sue on May 10, 2023.

19.     This action is timely filed.

**BACKGROUND**

20.     Ms. Skinski began her employment with Planar on November 20, 2017 in the position of General Manager, Broadcast and Media, in the Sales and Marketing Department.  Her direct supervisor was Adam Schmidt ("Mr. Schmidt"), SVP of Marketing, Sales and Pro Services.

21.     At all times during her employment, Ms. Skinski worked remotely from her home in Falls Church, Virginia.

22.     At all times during her employment, Ms. Skinski performed her job in an exemplary manner.

23.     Prior to her arrival in 2017, total revenue for Broadcast was approximately $2.1 million.  Since Ms. Skinski became General Manager of Broadcast, the vertical, Broadcast deals, has generated over $40 million in sales for the company.  The Broadcast and Media vertical sells products for that specific audience.  Ms. Skinski had responsibility of all Broadcast and Media sales for North America.  There are RAMs (Regional Account Managers) across the territories that sell to a variety of companies but the Broadcast vertical focused on a specific market. (e.g. CNN, FOX, NBCU, etc.).

24.     Ms. Skinski's portfolio of clients also increased dramatically.  The company had only a handful of clients prior to her arrival, and at the time of her termination there were over 30

new partnerships.  Ms. Skinski was also responsible for negotiating one of the top five largest sales in company history, valued at over $6 million.

25.     Ms. Skinski was a top performer each year.  In 2020 Ms. Skinski was a top three finalist for the company's "Rise Award" for sales.  In 2021, Ms. Skinski exceeded her financial targets.  At the time of her termination in May 2022 Ms. Skinski had achieved 40% of her target goal and was on track to meet or exceed her goals, with a significant pipeline of opportunities in process.

26.     Ms. Skinski was invited to/qualified for the "The President's Club" sales reward trip each year of employment (although the trip was not held in 2020 and 2021 due to the Covid-19 pandemic).

27.     During her tenure with Planar, the Broadcast vertical received approximately 20 congratulatory "cowbells."  A "cowbell" is an internal email sent to the entire company for a project win worth over $100,000.

28.     The Broadcast market was the first vertical to launch, and due to Ms. Skinski's leadership and strategy plan it became a successful model for the company, and soon other vertical markets were created based on the Broadcast model (*e.g.*, Sports & Entertainment, Rental and Staging, Government, Transportation, Strategic Accounts, and Residential Home and Virtual Production).

29.     Ms. Skinski never received any written or verbal performance reviews from Mr. Schmidt during her tenure, and she was never counseled for any performance related deficiencies.

30.     To the contrary, at internal and external company events and meetings, Mr. Schmidt praised Ms. Skinski on numerous occasions, as did Planar's CEO Zach Zhang ("Mr. Zhang").

31.     In 2019, Ms. Skinski received a $10,000 increase to her total compensation package.  Since 2019, Ms. Skinski did not receive any adjustments to her compensation package (including no cost of living adjustments), despite her requests.  Although Mr. Schmidt indicated (a few years ago) that he would review and adjust her income, no action was ever taken.

32.     In 2021, Ms. Skinski asked Mr. Schmidt if they could schedule a regular, recurring meeting, but he told her, "I don't believe in standing meetings."  Ms. Skinski communicated his response to Valerie Hillstad-Fliss ("Ms. Hillstad-Fliss"), Director of Human Resources ("HR").

33.     Ms. Skinski led the Broadcast and Media vertical, which was expanded to include Virtual Production as an emerging market. Her team included Alex Zou ("Mr. Zou"), who was her direct report from 2018 to May 2021.

34.     In May 2021, Mr. Schmidt segmented Virtual Production from the Broadcast vertical and established a new, independent Virtual Production vertical. Mr. Zou was named the General Manager of Virtual Production.

35.     On July 13, 2021, not even two months after his appointment as General Manager, Mr. Zou sent an email to Mr. Schmidt and Kim Brown ("Ms. Brown") (Marketing) regarding Ms. Skinski's participation in a Broadcast webinar.  He wrote, "This is another example of how she [Ms. Skinski] confuses our customers on who is leading the virtual production team.  In the future, our virtual production & XR team and Adam should lead all the virtual production & XR webinars."  Mr. Zou attached the webinar flyer, and was objecting to

Ms. Skinski's title (as a webinar speaker) on the flyer as General Manager of Broadcast, Media and Virtual Production.

36.     Mr. Zou was new to his job as General Manager, and had been under Ms. Skinski's purview until just two months prior to sending the July 13th email.  His email was unprofessional, hostile, and was an attempt to discredit and belittle Ms. Skinski's prior leadership, accomplishments and contributions to building the virtual production business.

37.     Ms. Brown responded to Mr. Zou that the issue had been discussed with Mr. Schmidt prior to the webinar, and it had been decided that Ms. Skinski was the best one for the role, based on her knowledge and experience.

38.     Also in July 2021, Mr. Zou was officially moved to report to Mr. Schmidt, since he was now in charge of a separate and distinct vertical from Broadcast and no longer reporting to Ms. Skinski.  Despite this change, Mr. Zou did not remove "Broadcast" from his email signature line, and was still inexplicably receiving commissions on pure broadcast deals (*i.e.*, those without a virtual production component) as of May 31, 2022.  Ms. Skinski questioned this on several occasions but never received any substantive response.

39.     In September 2021, Mr. Zou sent an unsolicited email outreach to a personal friend, and broadcast business customer of Ms. Skinski's at ESPN.  This communication was disruptive, in direct conflict with, and in disregard for, earlier discussions with Mr. Schmidt concerning communications by Mr. Zou with Broadcast clients (since he was no longer part of Broadcast), and it was an attempt to circumvent Ms. Skinski and undermine her relationship with ESPN.  Mr. Schmidt said he would "talk to him [Mr. Zou] again."  No further action was taken.

40.     Around the same time, Kim Brown also reported similar unprofessional and disrespectful behavior by Mr. Zou.  Again, nothing was done.

41.     On November 11, 2021, in accordance with Mr. Schmidt's prior email outlining areas of responsibilities/accounts, Gayle Welsh, Inside Sales Representative for Broadcast and Government accounts, (*i.e.*, Salesforce), changed ownership of some Broadcast deals.  Ms. Welsh had previously discussed this change with Mr. Zou. Subsequently, Mr.  Zou initiated an aggressive email exchange with Ms. Welsh about the change.

42.     Ms. Skinski was added into the email thread to provide context for the change and to reiterate the rules of process that were agreed upon by Mr. Schmidt. In her reply Ms. Skinski stated: "As agreed upon, we will work together on broadcast deals that have a virtual component to it.  As you moved on to focus on virtual production, you haven't been active in any of the broadcast deals and so it's way past time to make sure Salesforce is accurate" (in other words, remove him from Broadcast deals).

43.     Mr.  Zou replied to Ms. Skinski in a hostile manner (copying Mr. Schmidt), stating:

> To be clear, Zach [Zhang] knows exactly who developed those accounts, and that doesn't mean you will get all the credit for changing the account owners.
>
> Zach defines a good sale as having the ability to develop customers, not sitting on someone else's work.
>
> We've lost several broadcast projects recently, and I hope you spend your time on new customer development rather than creating internal friction.

44.     Mr. Zou also sent a hostile email to Mr. Schmidt that same day (copying Ms. Skinski, Ms. Welsh and others):

> Well, the clients I worked so hard to develop end up being someone else,
> There's no reason for me to develop new customers.
>
> So let her be in charge of virtual production, let her find new customers if she can.
>
> From the beginning, I knew that the first step was to transfer my broadcast customers out; the second step was to make me take responsibility for the failure

of virtual production market development; the third step was to fire me from Planar.

Take it all!

45.     Ms. Skinski was shocked by Mr. Zou's hostile and derogatory responses, which falsely accused her of taking credit for someone else's work and implied Ms. Skinski needed to rely on him to develop customers.  Nothing could be further from the truth.  As detailed above, Ms. Skinski's track record and success at Planar speaks for itself.  Mr. Zou, who had been Ms. Skinski's direct report four months earlier, then admonished and reprimanded Ms. Skinski in an extremely belittling and derogatory tone.  To Ms. Skinski's knowledge, neither Mr. Schmidt nor anyone else took any action as a result of Mr. Zou's unprofessional and hostile conduct towards her.

46.     However, on December 1, 2021, during an in-person meeting with Stephanie Hines ("Ms. Hines") (General Counsel and VP of HR) and Mr. Schmidt, Mr. Schmidt stated that he had communicated with Mr. Zou immediately after seeing the email (and he said Mr. Zhang did also) to discus his behavior, and that "no further punishment" was needed.  Ms. Skinski was not apprised of what had been discussed with Mr. Zou, or what action was taken to rectify or modify his continuing unprofessional and hostile conduct (if any).

47.     On January 19, 2022, during the Company Awards night (part of the annual Sales Kickoff Meeting), Mr. Schmidt praised Ms. Skinski's leadership and efforts on handling difficult projects, and noted that Ms. Skinski had overachieved her sales goals for 2021.  He also stated that Broadcast (the department Ms. Skinski managed) was "a barometer of the health" of the company.

48.     On April 18, 2022, Ms. Skinski learned that Mr. Zou had once again reached out to her Broadcast and personal contacts and invited them to a dinner event without her knowledge. Upon learning of this, Ms. Skinski questioned Mr. Zou on his unauthorized outreach, he responded that Ms. Skinski needed to "reset [her] mindset."  Ms. Skinski replied to Mr. Zou, objecting to his tone, and stated that she should have received a head's up or courtesy call before he reached out to her personal contacts.

49.     For context, Mr. Zou sent Ms. Skinski an email, after her learning of his invitation, to ask if he could invite his XR Virtual Production "Hollywood" customers to a happy hour event Broadcast was hosting on April 24.  His team had a dinner planned for later in the evening, and he asked if his customers could join the Broadcast happy hour event. Ms. Skinski told him he could invite "his customers" to the Broadcast event but Ms. Skinski stated that she was confused by his ignoring, yet again, the agreed upon process for communicating with Broadcast customers, whom Ms. Skinski knew he had also reached out to regarding his dinner. (As an aside, some of Mr. Zou's Virtual Production invitees did attend the Broadcast event, but Mr. Zou did not show up. Ms. Skinski had to manage the situation in his absence.)

50.     Aside from the fact that Mr. Zou's response made no sense, Mr. Zou had been separated from the Broadcast team almost a full year prior to this.  Ms. Hillstad-Fliss confirmed this to Ms. Skinski in writing the next day ("… Alex is not a part of Broadcast….").

51.     In late April, 2022, an opportunity arose with CNN that included a virtual production component.  On April 28, 2022, Ms. Skinski sent an email to Mr. Zou and the broader team for input.  After a few days of back-and-forth emails between the team, on May 2, 2022, Mr. Zou removed Ms. Skinski from the communications.  Ms. Skinski learned this when the

most recent email was forwarded to her by another team member with the message, "FYI… Saw you were not copied by Alex….Some kids…"

52.     The fact that Mr. Zou intentionally removed Ms. Skinski from the email chain (which Ms. Skinski had initiated) strongly suggests that he was aware of her imminent termination.

53.     In addition, Mr. Schmidt, Stephanie Hines ("Ms. Hines") (General Counsel and VP of HR), and Valerie Hillstad-Fliss ("Ms. Hillstad-Fliss") (Director of HR), were all aware that Ms. Skinski was managing the care for her elderly parents in Connecticut.  Both had chronic health conditions, and both had required multiple trips to the ICU/hospital since late February 2022.

54.     Specifically, Ms. Skinski's father was admitted to the ICU on February 23, 2022 and then discharged to a rehabilitation facility for six weeks, followed by a stay at an assisted living facility.  During his stay at the assisted living facility, Ms. Skinski's father had one additional visit to the hospital, and then in late April, the facility underwent a two week lockdown protocol due to a Covid outbreak.

55.     During this same time, on March 11, Ms. Skinski's mother was admitted to the hospital.  During the course of the year, Ms. Skinski's mother was admitted to the hospital a total of six times, three of which were ICU admissions.

56.     Ms. Skinski was/is the legal power of attorney for both of her parents.  Once Ms. Skinski's father was hospitalized, he was no longer capable of acting as the health advocate on site for his wife, that responsibility fell to Ms. Skinski.

57.     As a result of the circumstances described above, on Friday, April 29, 2022, Ms. Skinski reached out to Ms. Hillstad-Fliss, by email, indicating her need to take FMLA leave to

care for her parents.  Ms. Skinski received the FMLA documents from Brenda Hoff, HR

Generalist, that same day.  Ms. Hillstad-Fliss, Mr. Schmidt and Ms. Hines were all well aware of

Ms. Skinski's family situation well before her request.

58.     Despite the difficulties and emotional hardships Ms. Skinski was facing in caring

for her parents, Ms. Skinski remained a top performer, having  already achieved 40% of her

target goal by this time, with over 40 opportunities still in her pipeline. She was well on track to

meet, and achieve, her goals for the year.

59.     On the morning of May 2, 2022, Ms. Skinski submitted FMLA paperwork via

email to Ms.  Hillstad-Fliss and Brenda Hoff, and was granted provisional approval (pending

doctor's verification) for her leave request to be on site and advocate/care for her mom's

emergent health issues.

60.     That same afternoon, after she submitted her FMLA paperwork, Ms. Skinski was

notified by Mr. Schmidt and Ms. Hines that Mr. Zhang had made the decision to eliminate the

Broadcast vertical, and her employment was therefore terminated.  Ms. Skinski was further

informed that her job was being "reallocated" to field/regional managers.

61.     The reasons given for the elimination of Broadcast were cash flow and "pressure

on the company."  These reasons did not make sense given the company's $260 million target

goal for 2022, when Broadcast had been one of the most profitable divisions in the company

since Ms. Skinski joined the company. Notably, the Company made its targets goals for Q1 and

Q2/2022.

62.     This was confirmed  by a former Director level employee within the Finance

organization who indicated on numerous occasions that the Broadcast vertical was the most

profitable group.

63.     Ms. Hines also commented, unprompted, that the termination had "nothing to do" with Ms. Skinski's FMLA leave request, which Ms. Hines acknowledged she was aware of, but that it "didn't make sense" for Ms. Skinski to take FMLA leave and then come back to work to be terminated.

64.     The reason given for Ms. Skinski's termination – a "business decision" – was pretextual and false.  Ms. Skinski was terminated immediately after giving notice of her intent to exercise her right to take leave consistent with Planar's policies, and consistent with the FMLA, and after her repeated reports of Mr. Zou's hostile, unprofessional, inappropriate and illegal conduct towards her, and her insistence that Planar take action to stop Mr. Zou's conduct.

65.     Prior to her May 2, 2022 termination, Ms. Skinski had not had a verbal discussion with her supervisor, Mr. Schmidt, since they had met in December 2021 (they had only communicated by email).  Mr. Schmidt avoided Ms. Skinski during the National Association of Broadcasters convention in April 2022, and her requests for calls regarding business issues were ignored.

66.     Also on Tuesday, May 3, 2022, Ms. Hines and Mr. Schmidt contacted Barry Belsky ("Mr. Belsky") – one of Ms. Skinski's direct reports, and John Yu – a contractor working with Ms. Skinski, to discuss the elimination of the Broadcast vertical team.  Ms. Hines  and Mr. Schmidt communicated that Ms. Skinski was "stepping out" when, in fact, Ms. Skinski was being forced out.

67.     In addition, Mr. Belsky told Ms. Skinski that at the time he was notified of the Broadcast elimination, he was informed that he could pursue other opportunities within the Company.

68.     Ms. Skinski was not offered this same opportunity to pursue other opportunities within the Company even though there was an open role based in D.C. and Amber King ("Ms. King"), the hiring manager, had even reached out to Ms. Skinski and asked if she would be interested in the role, stating that Ms. Skinski was "a perfect fit."  However, when Ms. King reached out to Ms. Hines, she was told "no" and advised not to move forward with pursuing/offering Ms. Skinski the role.

69.     In sharp contrast, there was an open position in the New York area for an Application Engineer, which was discussed with Mr. Belsky.  The hiring manager, Tani Klein, subsequently changed the title of the open requisition to "Technical Account Manager" and created the position for Mr. Belsky.  Mr. Belsky was not made to apply for the role, and he was allowed to transfer as a remote employee (so he would not need to relocate to New York).

70.     The reason given for Ms. Skinski's termination – a "business decision" – was pretextual and false.  Ms. Skinski was terminated after Ms. Skinski she Alex Zou's unprofessional, hostile, demeaning and discriminatory conduct towards her to the Company's attention, and asked that action be taken.  Mr. Zou also treated other women at Planar, including Kim Brown and Amber King, in a hostile and demeaning manner.  Despite this, nothing was done, which only served to ratify and condone Mr. Zou's hostile and discriminatory conduct towards Ms. Skinski and other female employees.

71.     In fact, in an effort to remove Ms. Skinski and retain Mr. Zou, Planar used the fact that Ms. Skinski would need to be out of the office to force her out of the organization.

72.     Planar has also demonstrated a pattern and practice of discriminating against female employees. In the nine months (approximately) prior to Ms. Skinski's termination, three other women in leadership positions left the Company, and sent letters to HR regarding the

hostile work environment, bullying and favoritism/discrimination (Megan Riddle, Kamera Laws, and Tamara Gaubatz).

73.     In addition, a male Regional Sales Manager (which is a rank below Ms. Skinski's position) who had been employed less than two years and who was furloughed during Covid, brought back on, and then later terminated was given a year of severance.  In stark contrast, Ms. Skinski, who had been a top performer and employed since November 2017 was only offered an amount equal to four months of her base salary (minus withholdings) as severance.

74.     Also, despite the reasons given for Ms. Skinski's termination ("cash flow" and "pressure on the company"), within a year of Ms. Skinski's termination, at least four individuals within the Sales organization were elevated to Vice President.

### COUNT ONE -
### RETALIATION IN VIOLATION OF THE
### FAMILY AND MEDICAL LEAVE ACT

75.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

76.     Planar retaliated against Ms. Skinski after she indicated her intent exercise her right to take leave consistent with Planar's policies, and consistent with the FMLA.

77.     Mr. Schmidt, Ms. Hines, and Ms. Hillstad-Fliss were aware that Ms. Skinski was managing the care for her elderly parents in Connecticut, both of whom had chronic health conditions, and both of whom had required multiple trips to the ICU/hospital since late February 2022.

78.     On Friday, April 29, 2022, Ms. Skinski reached out to Ms. Hillstad-Fliss and indicated her intent to take FMLA leave.  She submitted the completed FMLA paperwork to HR on the morning of May 2, 2022.

79.     That same afternoon, on May 2, 2022, Ms. Skinski was notified by Mr. Schmidt and Ms. Hines that Mr. Zhang had made the decision to eliminate the Broadcast vertical, and that her employment was therefore terminated.  Ms. Skinski was further informed that her job was being "reallocated" to field/regional managers.

80.     The reasons given for the elimination of Broadcast were cash flow and "pressure on the company."  These reasons did not make sense given the company's $260 million target goal for 2022, when Broadcast has been one of the most profitable divisions since Ms. Skinski joined the company.

81.     Ms. Hines also commented, unprompted, that the termination had "nothing to do" with Ms. Skinski's FMLA leave request, which Ms. Hines acknowledged she was aware of, but that it "didn't make sense" for Ms. Skinski to take FMLA leave and then come back to work to be terminated.

82.     Planar terminated Ms. Skinski after she notified Planar of her intention to take leave under the FMLA, consistent with Planar's policies, and consistent with the FMLA.

83.     Planar terminated Ms. Skinski the same day she filed the FMLA paperwork indicting her intent to take FMLA leave, in retaliation for her exercise of rights granted under the FMLA, and consistent with Planar's policies.

84.     By terminating Ms. Skinski in violation of federal law, Planar evinced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Skinski.

85.     Planar engaged in these practices with malice and with reckless indifference to the federally protected rights of Ms. Skinski, within the meaning of 29 U.S.C. § 2617, for which Ms. Skinski is entitled equitable relief, including employment and reinstatement.

86.     As a direct and proximate result of the Defendant's actions, Ms. Skinski has suffered and continues to suffer, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

87.     Due to the severity of the conduct, Ms. Skinski is entitled to liquidated damages.

## COUNT TWO -
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT DURING THE COURSE OF EMPLOYMENT IN VIOLATION OF TITLE VII

88.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

89.     Defendant discriminated against Ms. Skinski, treated Ms. Skinski in a disparate manner, and subjected Ms. Skinski to a hostile work environment because of her gender (female).

90.     Acts of discrimination included:

- Failing to adjust or otherwise increase Ms. Skinski's compensation package since 2019, despite her being a top performer, exceeding her sales goals, and leading the strategy for the Broadcast vertical which became the Company model to launch other verticals;

- Mr. Schmidt refusing Ms. Skinski's request for a standing meeting, because he "doesn't believe" in them;

- Failing to take action in response to Ms. Skinski's complaints, and thereby condoning and ratifying, Mr. Zou's hostile, demeaning, unprofessional and inappropriate treatment of Ms. Skinski;

- Failing to respond to Ms. Skinski's inquiries and allowing Mr. Zou to continue to receive commissions on Ms. Skinski's Broadcast deals, even after Mr. Zou was no longer part of the Broadcast team;

- Allowing Mr. Zou to circumvent Ms. Skinski and undermine her relationships with Broadcast clients and not taking an effective action when Ms. Skinski complained;

17

- Failing to take effective action against Mr. Zou, and thereby condoning and ratifying his conduct, when Mr. Zou removed Ms. Skinski from an email thread related to Broadcast, which had been initiated by Ms. Skinski;

- Failing to take effective action against Mr. Zou when he falsely accused Ms. Skinski, in writing (to Ms. Skinski and Mr. Schmidt) of taking credit for the work of others;

- Mr. Schmidt avoiding Ms. Skinski during the National Association of Broadcasters convention in April 2022, and ignoring her requests for calls regarding business issues;

- Offering Barry Belsky the opportunity to pursue other opportunities within the Company after Broadcast was eliminated, but not offering Ms. Skinski the same opportunity;

- Not allowing Amber King, the hiring manager for an open role based in D.C. (for which Ms. King said Ms. Skinski was a "perfect fit" for) to pursue or offer the role to Ms. Skinski, while allowing an open position in the New York area for an Application Engineer to be altered to create a position for Mr. Belsky, and then hiring Mr. Belsky for the role with no formal application process, and then allowing him to transfer as a remote employee (so he would not need to relocate to New York).

91.     Planar has demonstrated a pattern and practice of discriminating against female employees.  In addition to failing to take any effective, remedial action in response to Kim Brown's complaint of unprofessional and disrespectful conduct towards her by Mr. Zou, in the nine months (approximately) prior to Ms. Skinski's termination, three other women in leadership positions left the Company, and sent letters to HR regarding the hostile work environment, bullying and favoritism/discrimination (Megan Riddle, Kamera Laws, and Tamara Gaubatz).

92.     Therefore, Planar was on notice of the propensity of Mr. Zou and others to discriminate against women, at the time Ms. Skinski was complaining and reporting the conduct, and when it terminated Ms. Skinski.

93.     Male employees were not subjected to similar treatment.

94.     Defendant's discriminatory treatment of Ms. Skinski violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

95.     In discriminating against Ms. Skinski in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Skinski.

96.     As a direct and proximate result of Defendant's actions, Ms. Skinski  has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

97.     Due to the conscious disregard for Ms. Skinski's federally protected rights, and the severity of Defendant's conduct, Ms. Skinski is also entitled to punitive damages.

### COUNT THREE –
### RETALIATION/TERMINATION IN VIOLATION OF TITLE VII

98.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

99.     Ms. Skinski was vocal in her objections to the hostile and discriminatory treatment to which she was subjected based on her gender, particularly by Mr. Zou.

100.     Ms. Skinski was terminated after she brought Alex Zou's unprofessional, hostile, demeaning and discriminatory conduct towards her to the Company's attention, and asked that action be taken.  Mr. Zou also treated other women at Planar, including Kim Brown and Amber King, in a hostile and demeaning manner.  Despite this, nothing was done, which only served to

ratify and condone Mr. Zou's hostile and discriminatory conduct towards Ms. Skinski and other female employees.

101.    The reasons given for the elimination of Broadcast and Ms. Skinski's retaliatory termination were cash flow and "pressure on the company."  These reasons did not make any legitimate business sense given the company's $260 million target goal for 2022 when Broadcast had been one of the most profitable divisions since Ms. Skinski joined the company.  The reasons given for Ms. Skinski's termination were false and pretextual, and were an attempt to conceal Planar's retaliatory termination of Ms. Skinski.

102.    Planar's retaliation/retaliatory termination of Ms. Skinski is in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*..

103.    In retaliating against Ms. Skinski in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Skinski .

104.    As a direct and proximate result of Defendant's actions, Ms. Skinski  has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

105.    Due to the severity of Defendant's conduct, Ms. Skinski is also entitled to punitive damages.

20

## **PRAYER FOR RELIEF**

WHEREFORE, KATHLEEN M. SKINSKI requests that this Court enter judgment in her favor against Defendant PLANAR SYSTEMS, INC., and further:

a)   Award Ms. Skinski compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One through Three; and in addition

b)   Award Ms. Skinski liquidated damages on the above stated Count One; and in addition

c)   Award Ms. Skinski punitive damages on Counts One and Two per the statutory cap; and in addition

d)   Award injunctive relief consisting of an order prohibiting the Defendant from engaging in further employment practices that create or tolerate a discriminatory, hostile or retaliatory work environment; and in addition

e)   Award Plaintiff her costs, including but not limited to reasonable attorneys' fees and any expert witness fees, and in addition

f)   Award Plaintiff such other and further relief as may be appropriate.

**<u>JURY DEMAND</u>**

**PLAINTIFF KATHLEEN M. SKINSKI DEMANDS A TRIAL BY JURY.**

August 3, 2023                                  Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, VSB 44803
CHARLSON BREDEHOFT COHEN
 BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
cbrown@cbcblaw.com
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Kathleen M. Skinski*